Good morning, Your Honors. May it please the Court, Counsel, my name is Amy Armstrong, this is Emily Skinner, and we're here on behalf of Petitioner Martine Fong. Mr. Fong's conviction is built on a foundation of deceit. The deceptions began in Detective Godoy's investigation and reporting, continued with former Prosecutor Peasley's disclosure violations, and culminated at Mr. Fong's trial when Detective Godoy testified falsely, Prosecutor Peasley argued the falsities in his rebuttal closing argument, and vouched for Godoy's credibility. Due to Peasley and Godoy's testimonial misconduct at the co-defendants' trials and retrials, Detective Godoy was discharged from the Tucson Police Department, and Prosecutor Peasley was ultimately disbarred. Mr. Fong's adult co-defendants have been relieved of all criminal liability in this case, but largely due to Mr. Fong's trial and Direct Appeal Counsel's conflict of interest, Mr. Fong remains convicted in violation of due process. The misconduct in this case is pervasive, and the state courts were unreasonable in denying relief to Mr. Fong. I would like to focus this Court on the certified and the uncertified misconduct claims. As a fundamental matter, this Court should order full briefing, supplemental briefing, on the uncertified misconduct claims, including the Brady violations, the vouching, and the falsification of Wood's testimony. Mr. Fong easily meets the SLAC certificate of appealability standard. Reasonable jurists could disagree with the District Court's resolution of these claims. And more importantly, the U.S. Supreme Court has said as long ago as in Berger that prosecutorial misconduct claims should be considered cumulatively. And this Court's case law requires that if you have a compound misconduct case, such as Mr. Fong's, that you consider the NAPU claims first under that slightly lower materiality standard, that whether there's any reasonable likelihood that the outcome could be different. Determine whether the NAPU violations were material. And if the violations fall short, then to move on and consider the Brady claims under the Brady standard and consider collectively all the evidence together. We submit, Your Honors, that in this case, which is so compound in terms of the different instances of misconduct, that the only true way to come to a just resolution is to certify the uncertified claims and consider all the evidence together. In terms of the certified NAPU Al Corte violation, the record speaks for itself. Detective Godoy, on direct examination, testified falsely, or at minimum left a false impression with the jury, that he first learned of his suspects, McCrimmon, Manette, and Fong, or Chachi. Those terms are used very alternatively in the record, from Keith Woods. Worse, on cross-examination, Detective Godoy falsely stated that the first time he learned of McCrimmon, Manette, and Chachi were during the September 8th interview with Woods. Peasley failed to correct that statement. He's admitted in other proceedings that he failed to correct that statement. The worst part of the NAPU violation happens in Prosecutor Peasley's closing argument. After all the evidence had been presented and the arguments were made, Peasley, in an effort to bolster Godoy's credibility, argued the falsehoods twice and then vouched for Godoy's credibility. So the last lingering impression on the jury was the impression that Godoy had gotten all his information from sources whose credibility the jury was able to evaluate at trial. And that simply was not true. We think there is little to no debate that Peasley and Godoy knew or should have known. We think that the testimony was false. Their admissions in collateral proceedings, which were before the State court, admit as much. Furthermore, Godoy's reports, both the disclosed and the undisclosed reports, indicate that that was not the sequence of events. So the real question before this Court is the materiality of the NAPU violation. Counsel, your questions about your claim that Mr. Godoy testified falsely depends on being able to show that Godoy had learned of the identity of at least of Chachi sometime in August, which would have been a week before the September 8th interview with Keith Woods. Is that right? Yes, Your Honor. And the reports of Godoy, in particular the disclosed September 15th report, which there's no dispute that that was the trial counsel had that report and used it at trial. And also the undisclosed report show that although those reports are very inconsistent with one another, each of them demonstrate that before Godoy spoke with Woods, he believed Fong was Chachi. Okay. But the evidence that was introduced at trial, the prosecution attempted to introduce the evidence from the two confidential informants, one which was the call to Sergeant Zimmerling, sir. Zimmerling, and the other was the call to Godoy. And counsel objected, defense counsel objected to the introduction of that. That would have suggested, then, that Godoy did have information before September 8th, wouldn't it? Your Honor, that is true. That objection was made. Our position is that that did not cure the violation for several reasons. So where is the violation? What is it that Godoy said that was either left a false impression or simply was outright false? Yes, sir. Well, that left a false impression on direct examination. And that was the phraseology by Peasley. I'm sorry. Let me step back one moment and say Woods had testified before Godoy was called. And Woods testified to a number of things, including that he became an informant in the case late in August. On direct examination of Godoy, Peasley asked Godoy to focus on the period between June 24th and the end of August and asked whether he had developed any information to cause him to suspect McCrimmon, Manette, or Fong. And Godoy answered negatively, no. And that was addressed by the Arizona Superior Court and addressed by the magistrate? Yes, yes. As to whether the phrase end of August was in some way misleading or false? Absolutely. Because what Godoy testified that he got the information on August 31st. Right. Our position is that that was simply misleading at this point on the direct examination. Then Peasley followed up with a question about when the police actually contacted Fong. And that was phrased as after the conversation with Keith Woods did the police contact Fong. So again, that implied it was not patently false, but it implied that Woods was the source of Godoy's information about his suspects. I'm a little confused. Did the police contact Fong after talking with Woods? Yes, sir. But Godoy investigated him before. Okay. But if the question is did the police contact Fong after September 8th, would the correct answer to that question is what? Yes. It is. It is. That's not misleading, is it? It's not false. We believe it set the stage. But on cross-examination, absolutely Godoy testified falsely. The question, quote, is so when you were saying to Mr. Woods and what Mr. Woods was saying to you was committed on tape, that's correct. And the course of that, in the course of that statement is when you learn about McCrimmon and Mr. Manette, yes, and this third person named Chachi, that's correct. Those answers were false. Peasley admitted in Mr. McCrimmon's trial that those answers, that this particular answer by Godoy on this particular date was false and that he failed to correct it. But we think what really, what the Nehpoo violation really manifested on, in the closing, because that's when Peasley made the decision to use that testimony that he knew was false to bolster Godoy's credibility. And that's the real due process problem here. In light of trial counsel's strategy, in light of Mr. Sturinger's trial strategy, where is the problem? Your Honor, the problem is the clearly established Federal law imposes an affirmative and independent duty on prosecutors to correct false testimony when it appears in trial. I got that. That's easy. I got that. Where's the problem here? In light of Sturinger's, I understand the problem in the subsequent trials of McCrimmon and Manette. In light of Sturinger's strategy here, and he's very clear as to what his strategy was and why he called Woods instead of the, and not the prosecution. The problem here is that your client had his fingerprints at the scene. And that was big. And that was not a problem that either Mr. Manette or Mr. McCrimmon had in their trials. So in light of Sturinger's trial strategy, where is the problem? Yes, Your Honor. Just to correct that, there was fingerprint evidence in McCrimmon's trial. McCrimmon's fingerprint was on the getaway car. And when his jury learned of the truth and of the misconduct in this case, that jury acquitted him in 42 minutes. The problem is, you know, defense counsel may not have realized, but Peasley realized during closing arguments that the defense case was hinging on Godoy's credibility. And he had an opportunity to bolster Godoy's credibility by making these arguments. The main difference between what happened in Mr. Fong's trial and what happened in McCrimmon and Manette's trial is that the misconduct originated here and, and appeared in a defensive posture. Peasley, in rebuttal closing, was trying to protect Godoy, who had been to some degree impeached by defense counsel. In McCrimmon and Manette's trials and retrials, Peasley realizing the, the vulnerable position that the defense were in in this case, and the Arizona Supreme Court speaks to this in the Manette opinion. Peasley, I think their words are, bullied the defense into submission, knowing that if they developed the truth about how Godoy had suspected these murders, that they would not be subject to Godoy's credibility. And that, that, using, the state using its power that way to develop false evidence and use a false argument in order to convict, in this case, a juvenile defendant of capital murder, is extremely serious. The, the, the state's case also, you know, very, the state's case very much hinged on Godoy's credibility, including the validity of that fingerprint evidence. The forensic investigation was significantly substandard. The chain of custody. I'm sorry. Mr. Godoy did not take the fingerprints, did he? He didn't. He did not. But he was, he collected the evidence at the scene. He transported the evidence back to the police station and didn't check it into evidence in supply. There's no chain of custody showing that it went from Godoy's, he called it a hijacked interrogation room. Counsel, this would really go to an argument that Mr. Godoy somehow tampered with the evidence, and you don't have anything to support that, do you? At this point, Your Honor, we don't. We did try to develop, we did try to, we did seek access to the fingerprint evidence. After the, the degree of Peaslee and Godoy's misconduct was discovered and developed over the course of the years, we tried to have an independent forensic examiner examine those prints. And to this day, we haven't had access to the evidence. But you're right, Your Honor. We're not here on an innocence claim, and we're not here on a sufficiency of the evidence claim. But I think it's very important that U.S. Supreme Court law in this Court's cases recognize that you need not reduce, I believe Kyles B. Whitley says, the quantum of inculpatory evidence in order to meet materiality. And that's even under Brady, under a higher standard than the NAPU is, is supposed to be analyzed under. You simply need to create any reasonable likelihood that the outcome could have been different. And we submit that it certainly could have, we easily meet that particular standard. I'd like to speak for a moment about the Brady violation before I reserve the rest of my time. The State court decision that the Woods, I'm sorry, that Godoy's September 9th case was unreasonable. There was a plethora of objective evidence in front of the State court that that was not disclosed, including the fact that it was not in trial counsel's file as received by post-conviction counsel. The State stipulated that it was not in the El Grande file, TPD's El Grande file. It was not stamped as disclosed. Stirringer did not use the report in any of his pretrial investigation. He didn't question Godoy about the report in pretrial interviews. He didn't use the report at pretrial hearings. The only evidence that suggested that the report was disclosed was Stirringer's equivocations in the post-conviction proceeding that he assumed he had seen the report. And that was given in the face of also testifying that he could not recall which reports he had seen in Peasley's file by virtue of representing him in the disciplinary proceedings and which materials he had seen during the course of representation of Mr. Fong. So we believe that that was objectively unreasonable finding, and the State court did not reach the materiality analysis. So that would be under AEDPA, that would be de novo by this Court if you find that the finding that the report was disclosed is unreasonable. So I would like to reserve my time, but we would – I'll address the rest after. Thank you.  Thank you. Good morning. May it please the Court. My name is Matthew Binford. I'm an Assistant Attorney General for the State of Arizona, and I represent the Director, Charles Ryan. I believe that the most important thing for this Court to take away from the briefing in this case and the arguments today is that Mr. Fong's trial was separate and distinct from the joint trial of Christopher McCrimmon and Andre Minnit, and it was separate from the subsequent retrials of both of those co-defendants. That's important for two reasons. The first reason that that's important is because the misconduct that occurred that was found to have occurred was in McCrimmon's trial and Minnit's trial. It wasn't in this trial. The claims about the perjured testimony were all in the subsequent trials of McCrimmon and Minnit. Second of all, the evidence in this trial was different. Judge Bivey, as you pointed out earlier, there was strong fingerprint evidence in this trial that wasn't in the other trials. Did Detective Godoy handle the fingerprints? I believe he transported items that had fingerprints on them. And there were six fingerprints on two separate baggies. There were three fingerprints on each plastic bag that was on the counter. There were also two fingerprints on a food stamp that was found next to one of the dead victim's bodies. Now, in regard to whether the prosecution knowingly suborned false testimony from Detective Godoy, those statements were not false. Counsel for Mr. Fong claims that Godoy falsely testified that he first began to suspect McCrimmon, Minnit, and Fong when he received information from Woods on September 8th. Now, the exact statement that he was asked on direct was, What I'm going to do is this. Ask you to focus on the time period of June 24th until the end of August 1992. During that time period, had you developed any information up to the end of August, had you developed any information that would lead you to believe that either Christopher McCrimmon, Andre Minnit, or Martin Fong were suspects in the killings of these three men at the El Grande market? And he says, No, sir. And now that's a factual statement. Godoy got the information about Fong, Soto, and that Chachi was Fong Soto on August 31st. If you, if the court agrees with me that the end of August is August 31st, and you put August 31st there instead of the end of August, that is a factual statement. So if you focus on the time period of June 24th until August 31st, 1992, during that time period, had you developed any information up to the, up to August 31st, had you developed any information that would lead you to believe that either of those three were suspects? He says, No, sir. So up until August 31st, that's a correct statement. He hadn't received any information that those three were suspects. What motive might Mr. Godoy have had for misrepresenting that? I don't believe that there was any motive for him to misrepresent that. Would it have been in the State's interest to have had, to have introduced the evidence from the confidential informants? Yes, it would have. But it's unlikely that they would have been able to do that without some waiver of hearsay or waiver of confrontation. If they had done that, that would have shown that, that Godoy had reason to suspect McCrimmon and Chachi prior to September 8th. That's correct. And on redirect examination of Detective Godoy, that's what Mr. Peasley attempted to extract. He attempted to point out, and this is on page 90, 89, 90, and 91, he attempts to point out that the first time he heard of Fong was on August 31st. And he also points out that he asked for employment records for Martin Soto in the first week of September. And the first week of September was clearly before the September 8th interview with Mr. Woods. In regards to the second statement, this was defense questioning, first of all, to point out. And he says, he's talking about Detective Godoy's interview with Mr. Woods. And he says, in the course of that statement, Mr. Woods' statement, is when you learn about McCrimmon and Mr. Minnett, yes, and this third person named Chachi. Well, he does learn about McCrimmon and Minnett in that statement, and he does learn about Chachi during that statement. He learns what their roles were. Woods claims that they were masked down. He learns that Chachi used to work at that store. Now, that's not to say that he didn't know those names prior. He didn't know those names August 31st or the first week of September. Was the question whether he first learned or whether he learned? No, it was not. It was not whether he first learned. It was just whether he learned. I know counsel for Mr. Fong said first learn, but that's not what the transcript says. I think the most important point on that argument is that during redirect, Mr. Peasley tried to clear up the record, and he tried to point out that August 31st was the first time that he had heard Mr. Fong's name, and that during the first week of September, that was when he got the employment records from the Gees. Now, there are other reasons why, or I can point out how this case was separate from the trials of Mr. Minnett and Mr. McCrimmon. First of all, in the openings here in Fong's case, Mr. Peasley doesn't even mention Woods' interview. Defense counsel argues that September 8th is the first break in the case, and that's when a person named Keith Woods comes into play. Now, that's defense counsel bringing Keith Woods into it, saying it's the first break in the case. Again, Mr. Peasley never mentioned Woods in his opening. However, in the Minnett-McCrimmon retrial, Peasley, during opening, said Godoy did not learn of McCrimmon, Minnett, or Fong before the Woods interview, and that he didn't know Fong was a former employee prior to the Woods interview. That's why there was misconduct found in the subsequent trial. That's from the N. Ray Peasley Arizona Supreme Court decision at paragraph 11. The statements made in opening and closing and the questions asked during the trial were different in the subsequent retrials. They were different. None of the misconduct happened here. In regards to Mr. Fong's ineffective assistance claim, all five justices on the Arizona Supreme Court and at least one Federal judge has found that Mr. Sternger's counsel his strategy was reasonable. Without calling Mr. Woods to testify, Mr. Sternger would not have been able to elicit that this Chachi person was a third party, that it was actually Martin Garza. By calling Mr. Woods, he was able to bring out that there was this third person, Martin Garza. And Martin Garza was very helpful because not only did he share the same nickname, Chachi, he shared a similar first name, whether it's Martin or Martin, it's the same first name. He lived in the same area near First and Prince Road near a Circle K, which Woods told Detective Godoy at the first meeting. And he also knew Christopher McCrimmon. He was an acquaintance of Christopher McCrimmon, and I believe he said that he had dinner at Mr. McCrimmon's house several times. This was a great third party defendant to put the blame on. And it also helped Mr. Sternger's strategy of discrediting Godoy. He was able to use the differences, the discrepancies between Mr. Woods' September 8th statement and his November 20th statement to make it seem as if Godoy fed, Detective Godoy fed Mr. Woods the statements before the November 20th statement. This was a highly, it was a very well thought strategy. He talked to his colleagues. He talked to Mr. Fong before going ahead with this strategy. And he subsequently went with it. And although it wasn't successful, it doesn't mean it was ineffective. It doesn't mean that there was no reason for it or that he was ineffective. As the district court found and the trial court found, Detective Godoy's September 9th report was disclosed. That was based on evidence and testimony during the state post-conviction proceedings that Mr. Sternger and Mr. Grimes both testified that they had seen the reports. They both testified that they had reviewed the Mariano file, and billing records confirmed that. Additionally, Pima County had an open file policy. And so they, when they went to look at those Mariano files, they would have had the chance to see that report. Mr. Sternger also testified that Detective Godoy at some point said he learned Fong's name from the gang unit. If he had not seen that September 9th report, it's unlikely that he would have made those statements. If the question has, if the court has any questions about any of the remaining uncertified claims, I'd be happy to answer those. I don't think there are any additional questions. All right. The State would rely on our arguments as stated in our briefs. And we would ask that you affirm the district court's denial of the habeas petition. Thank you very much. Okay. Thank you, counsel. Ms. Armstrong. Thank you, Your Honor. Peasley, as the Arizona Supreme Court found in the Manette case and also in Repeasley, Peasley could have elicited the fact that Godoy knew about his suspects before he spoke with Keith Woods without going into the hearsay. Instead, Peasley asked in this trial a question about how many sources from which Godoy had had. Why would it be in his interest? Why would it be in the State's interest to throw everything on the September 8th? Why wouldn't it be in the State's interest, as the State tried to do, to say, did you hear these names before Woods came up with them? That's like having two points and securing a line. And, Your Honor, I think that what we see in Mr. Fong's trial is that the State's strategy evolved as the trial continued. I don't think that going into it, it was Peasley's strategy to have the information coming from Woods. I think that there were issues. In some respects, he was forced to do that, wasn't he, by Stringer's objections to any information coming from the confidential informant. I think that Stringer's objections put pressure on Peasley to find ways to bolster Godoy's credibility. And that's fine. But he cannot do that by arguing false testimony. And that's a decision that he made here. It comes together in that rebuttal closing, and then it perpetuates on in the several other trials and retrials. In terms of the question that was asked on cross-examination, there is a temporal element to it. What Stringer asked in the September 8th interview, and this part is a quote, is when you learned, when you learned. So I would disagree with Respondent's characterization that that was not false. It was false. That is when he learned. That is not when he learned about his suspects. In terms of the ineffective assistance of counsel claim, the Arizona Supreme Court that Respondent cites the footnote in that direct appeal opinion, the Court was not considering Mr. Fong's ineffective assistance of counsel claim on the merits in that opinion. It was making a comment about Stringer's strategy in a footnote. So I don't think that that is entitled to any deference under EDPA to this Court. Instead, you would look to the State Post-Conviction Court's resolution of that claim when you're considering that claim. And in terms of Respondent's position that banks, that an open file policy satisfies and somehow cures the disclosure violations in this case, we think that Banks v. Drecke is clear that just saying come over and look at my file is not, does not satisfy Brady when you have exculpatory evidence that you should affirmatively disclose. Even under the higher Brady and Strickland materiality test, Mr. Fong does not have to show that he would have been acquitted or even that it's probable that he would have been acquitted but for the State's misconduct. He only needs to show that there's a reasonable likelihood that the outcome would have been different. It was 21 years ago today that was 17-year-old Martin Fong's last day of freedom, and Peasley and Gajoy's misconduct violated Mr. Fong's rights to due process and importantly disparaged the integrity of the criminal justice system. We believe that the most swift and just resolution is for this Court to grant relief and grant the writ on the certified NAPU claims, but we adamantly urge this Court to certify the uncertified claims at minimum and consider all of this pattern misconduct collectively as this Court's cases require. Under Mr. Fong's – under this Court's precedence, we don't believe that Mr. Fong has received a trial that's worthy of confidence, and that's really what this Court should look at and decide in this matter. There are no further questions. Thank you, counsel. The case before us has a very, very troubling history, and we appreciate both counsel for the manner in which you've argued the case and briefed it. Thank you very much. The final case on the oral argument calendar is Doe v. Harris.
judges: Timlin, Schroeder, Bybee